**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**GREIF PACKAGING, LLC,**

        **Plaintiff,**

        **v.**

**TRANSCEND TRANSIT, LLC, et al.**

        **Defendants.**

**Case No. 2:25-cv-345**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Vascura**

## OPINION AND ORDER

Defendants Transcend Transit, LLC, Excel Transport, LLC, Robert L. Mack Jr. (acting collectively through one motion, *see* Doc. 15), and Deborah A. Davis (through another, *see* Doc. 16), move to dismiss Plaintiff Greif Packaging, LLC's Complaint (Doc. 1), or alternatively seek to have the Court transfer the case to the Southern District of Texas.[1] The Complaint alleges that these four Defendants (along with another defendant, Alexander Silva, who is in default) combined to defraud Greif out of more than a million dollars. Seeking to recover the funds, Greif asserts a slew

---

[1] Technically, Defendants seek dismissal on forum non conveniens grounds. But forum non conveniens applies only if the proposed alternative forum is abroad. *Zions First Nat'l Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 523 n.1 (6th Cir. 2010). Here, however, the proposed alternative forum is the Southern District of Texas. Accordingly, the Court construes Defendants' motions as requests to transfer under 28 U.S.C. § 1404(a). *Id.* ("If another federal district is an alternative forum, dismissal on grounds of forum non conveniens is inapplicable and § 1404(a) applies." (emphasis omitted)); *Leonard v. Bed, Bath & Beyond, Inc.*, No. 2:14-cv-2357, 2015 WL 3440852, at *2 (D.N.J. May 22, 2015) (citation omitted) ("[W]hen there is another appropriate federal district court forum, the motion for dismissal on forum non conveniens grounds is best treated as a motion to transfer." (emphasis omitted)); *Triangle Fastener Corp. v. Connective Sys. & Supply, Inc.*, No. 2:24-728, 2024 WL 4349234, at *2 (W.D. Penn. Sep. 30, 2024) (quoting *Leonard*, 2015 WL 3440852, at *2) (same).

of claims under the Racketeer Influenced and Corrupt Organizations Acts (RICO), the Ohio Corrupt Practices Act, and numerous other state-law theories. For the reasons set forth below, the Court **DISMISSES** Excel **WITHOUT PREJUDICE**, and then **TRANSFERS** the case to the Southern District of Texas, (Docs. 15; 16).

## BACKGROUND

Greif Packaging, a Delaware LLC, is an industrial packaging products and services company. (Doc. 1, #4). Its principal place of business is a different Delaware—the city in Ohio. (*Id.*). The gist of Greif's Complaint is that two of its former employees, Deborah A. Davis and Alexander Silva, colluded with two transportation companies, Transcend Transit LLC and Excel Transport LLC, to defraud Greif out of more than one million dollars. (*Id.* at #2–3). Robert L. Mack Jr., Davis's brother, owns both companies. (*Id.* at #23). While that may sound straightforward, describing the various schemes that Greif alleges requires an understanding of Greif's operations in Texas, Greif's relationship with Transcend and Excel, and the roles that Davis and Silva played at Greif.[2]

**A. Greif's Texas Operations, Contracts with Transcend and Excel, and Employment Relationships with Davis and Silva.**

Start with Greif's Texas operations. Greif maintains two facilities, "Houston Steel 1" (HS1) and "Houston Steel 2" (HS2), in La Porte, Texas. (*Id.* at #6). Each

---

[2] Because this matter is before the Court on a motion to dismiss, the Court accepts the factual allegations in the Complaint as true and relies on them to describe the background below. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quotation omitted). That said, the Court reminds the reader that they are still only allegations at this point.

facility produces steel drums. (*Id.*). Greif's Shipping Coordinator, the position in which Defendant Silva worked until he resigned in February 2024, plays an "important role" at the company by "(1) managing int[er]-facility[3] transfers between HS1 and HS2; (2) managing incoming and outgoing shipments; and (3) organizing shipments to customers through BluJay," the software Greif uses to track and log its shipments. (*Id.* at #5–6). The first of these tasks—inter-facility transfers—involves a three-step process. First, Greif's customer-service department receives a sales order for processing. (*Id.* at #6). These orders are processed through Greif's Enterprise Resource Planning System (ERP), which Greif refers to as "SBP" in its Complaint. (*Id.* at #5). That system is "located" in Delaware, Ohio.[4] (*Id.*). Second, the Shipping Coordinator (again, Silva) solicits rates from a list of contracted carriers in Greif's system, which are then uploaded to BluJay. (*Id.* at #6). Third, BluJay recommends a carrier based on the lowest bidder, and the Shipping Coordinator then assigns a specific carrier to transport the order either from HS1 to HS2 or from HS2 to HS1. (*Id.*).

To ensure that it can meet shipping demands, Greif maintains a fleet of trailers at both HS1 and HS2. (*Id.*). Maintaining that fleet involves "recovery and redeployment" of the trailers when they are needed elsewhere. (*Id.*). Just like it does

---

[3] Greif's Complaint uses the term "intra-facility" transfer, but the Court notes that "inter-facility" transfer is a more apt description of the conduct that Greif alleges—moving trailers between HS1 and HS2, or vice versa. *See, e.g.*, Bryan A. Garner, Garner's Modern English Usage 611 (5th ed. 2022) ("*Inter-* means 'between, among.' *Intra-* means 'within, in.'" (italics in original)).

[4] The Court adopts this description for purposes of relaying Greif's allegations. But the Court also notes that it is not sure what it means to say that a networked electronic system—which Greif's SBP system almost certainly is—is "located" in a particular place.

for inter-facility transfers, Greif also solicits bids from contracted carriers for recovering and redeploying the trailers. (*Id.* at #6–7). To assist Greif in its efforts to keep a close watch on where its trailers are located, Greif's trailers are often equipped with a GPS tracking device that both provides real-time tracking and stores the historical locations of the trailers. (*Id.* at #7).

All that brings the Court to Greif's relationship with Transcend and Excel. They are two of the "contracted carriers" that provide the services described above. More specifically, in 2018, Greif entered into a Transportation Agreement with Transcend, a Mississippi company. (*Id.* at #10; Doc. 1-4 (transportation agreement); Mack Decl., Doc. 15-1, #408). Mack, Transcend's owner, executed the Transportation Agreement on the company's behalf. (Doc. 1, #10; Doc. 1-4, #81). In the agreement, Transcend promised to provide motor carriage transportation and related services as Greif required. (Doc. 1, #10; Doc. 1-4, #75). The Transportation Agreement specifies that it is governed by Ohio law, and that "[a]ll judicial actions or arbitration proceedings affecting th[e] agreement shall be conducted in Delaware County, Ohio." (Doc. 1, #10; Doc. 1-4, #79). It also says that "[a]ny claim, dispute or controversy arising out of or relating to this Agreement, the relationship of the parties under this Agreement, or the breach of this Agreement, shall be determined by arbitration." (Doc. 1-4, #79). Separately, the Agreement required Transcend to "adhere" to Greif's "Supplier Code of Conduct." (*Id.*; Doc. 1, #10). Among other things, the Supplier Code requires Greif's suppliers to maintain "the highest standards of ethical conduct" and refrain from "[a]ll forms of corruption, extortion, fraud, bribery and embezzlement."

4

(Doc. 1, #7; Doc. 1-1, #66 (Supplier Code)). Suppliers must also "[d]ecline to enter into transactions that create a conflict of interest and report any situations that may appear as a conflict of interest," and "comply with all applicable national and local laws, rules, regulations and requirements." (Doc. 1, #7; Doc. 1-1, #66).

The following year, in 2019, Greif executed two similar agreements with Excel, another Mack-owned Mississippi enterprise. (Doc. 1, #10–11; Doc. 15-1, #408; *see* Doc. 1-5; Doc. 1-6). The first, a "Master Trailer Interchange Agreement," "allowed trailers operated by either Greif or Excel to 'be used in service of the other.'" (Doc. 1, #10; Doc. 1-5 (interchange agreement)). In other words, "it was a trailer-sharing agreement" between Greif and Excel. (Doc. 1, #10). A few months later, in July 2019, Greif and Excel executed a "Transportation Brokerage Agreement." (*Id.* at #11; Doc. 1-6 (brokerage agreement)). Under the Brokerage Agreement, Greif agreed that it would, from "time to time," tender freight to Excel, which would then "arrange for the pick-up, transport, and delivery of all freight tendered." (Doc. 1-6, #90). As he had done with Transcend's Transportation Agreement, Mack executed both the Interchange Agreement and the Brokerage Agreement on Excel's behalf. (Doc. 1, #10–11; Doc. 1-5, #88; Doc. 1-6, #95). Moreover, the Excel agreements contain forum-selection and choice-of-law provisions similar to those in Transcend's Transportation Agreement, as well as provisions requiring Excel to adhere to Greif's Supplier Code. (Doc. 1-5, #87; Doc. 1-6, #94).

Finally, consider Defendants Davis and Silva, who are two former Greif employees. Davis, Mack's sister, joined Greif as a Customer Service Specialist in

2002, many years before Greif's dealings with Transcend and Excel. (Doc. 1, #7). She worked at Greif's HS1 facility. (*Id.* at #8). Davis's job duties included, among other things: "providing support to customers … ; maintaining customer accounts and records of customer interactions; communicating pricing, shipping dates, and appropriate order information to customers; and collecting and entering orders for new or additional products or services." (*Id.*). When she joined Greif, Davis executed a Confidentiality Agreement that bars her from divulging, or using for the benefit of herself or a third party, various categories of information outlined in the Agreement. (Doc. 1, #7–8; Doc. 1-2 (confidentiality agreement)). Although Davis's Agreement contains a choice-of-law clause specifying that it "shall be governed by the laws of Ohio," it contains no forum-selection, arbitration, or Supplier Code clause. (Doc. 1-2, #70).

Silva, meanwhile, joined Greif as a Day Dispatcher in 2020. (Doc. 1, #9). Greif eventually promoted him to Shipping Coordinator. (*Id.*). In the latter position, Silva's job duties included, in addition to the duties already described above, "operating machinery, maintaining logs and records, inspecting equipment, receiving and processing orders, preparing documentation for shipments, and coordinating deliveries." (*Id.*). Silva signed a Confidentiality and Proprietary Rights Agreement when he joined Greif. (*Id.*; Doc. 1-3 (confidentiality and proprietary rights agreement)). That Agreement contains no choice-of-law, forum-selection, arbitration, or Supplier Code clause, but it bars Silva from disclosing several categories of Greif's proprietary information. (Doc. 1, #9; Doc. 1-3, #72).

**B.    Greif Launches an Investigation into Silva After a Whistleblower Reports Fraudulent Activity, and Greif Uncovers a Series of Fraudulent Schemes Involving Defendants.**

With the various players defined, let's next discuss the alleged schemes. In February 2024, Greif received a message from a former Transcend employee. (Doc. 1, #12; Doc. 1-7 (text message chain)). That message explained that Silva was "operating a pay to play" racket in which he "required drivers for various carriers to pay him cash kickbacks … for the 'right' to pull loads from Greif facilities." (Doc. 1, #12; Doc. 1-7, #102–04). That is, Silva was apparently charging shipping carriers on a weekly basis for access to "easy loads," and the ability to "recover empty trailers" from Greif. (Doc. 1, #12; Doc. 1-7, #102). The specific amount Silva charged a given carrier was a function of how many trucks the carrier maintained. (Doc. 1, #12; Doc. 1-7, #102). To substantiate the allegation, the whistleblower provided a video that allegedly shows Silva grabbing the cash the whistleblower provided to pull one of Greif's loads. (Doc. 1, #12; Doc. 1-7, #104). The whistleblower also suggested that Silva was splitting these ill-gotten gains with Davis. (Doc. 1, #12; Doc. 1-7, #103).

So Greif launched an investigation into Silva. (Doc. 1, #13). And that investigation revealed several allegedly fraudulent schemes involving the Defendants Greif names in its Complaint.

**1.    The Beaumont Yard Scheme.**

The first scheme that Greif uncovered involved a rental yard in Beaumont, Texas, which Transcend subleased to Greif. According to Greif, Transcend began leasing the yard in April 2020. (*Id.* at #14). Transcend then subleased the yard to

Greif for a monthly price of $2,000 from June 2020 to October 2023. (*Id.*; Doc. 1-9 (Beaumont Yard invoices)). Transcend invoiced Greif through a software application called Coupa, (Doc. 1, #14), which Greif uses to track its indirect spending, i.e., "expenses not directly related to Greif's production of materials," (*id.* at #6). Like BluJay, Coupa interacts with SBP, Greif's centralized ERP system, which is located in Delaware, Ohio. (*Id.* at #5–6). The Beaumont Yard was apparently used to facilitate transfers to a nearby client (which Greif does not identify in its Complaint). (*Id.* at #14). As Shipping Coordinator, Silva organized incoming and outgoing shipments from this yard. (*Id.*).

The distance between the yard and the client was some five-and-a-half miles. (*Id.*). And per Greif's estimation, delivery from the yard to the client should take approximately 90 minutes.[5] (*Id.*). But it turns out that Transcend was fraudulently "overcharging Greif for transportation services between the Beaumont [Y]ard and the client" by logging excessive hours for these trips. (*Id.*). For example, in an invoice dated August 11, 2023, Transcend billed Greif for a total of 47 hours supposedly worked between July 28, 2023, and August 3, 2023, at a total cost of $2,930. (*Id.* at #15; Doc. 1-10 (August 11, 2023 invoice and travel logs)). By Greif's estimation, these hours (and therefore the bill based on those hours) exceeded what was reasonably necessary for the services rendered.

---

[5] Consistent with what the Complaint suggests, the Court assumes that this figure includes, for example, the time it normally takes to unload the freight. (*See* Doc. 1, #14 ("Greif estimates that it should take approximately 90 minutes to *deliver goods* for this route." (emphasis added)).

8

The excessive time that Transcend billed is also reflected in trip logs that Manuel Morales and Ezequel Navarrete, two Transcend employees, produced in connection with their trips. (Doc. 1, #14, 16). For example, in his August 3, 2023, trip log, Navarette wrote that it took a total of five hours to complete two five-and-a-half-mile trips shuttling trailers from the Beaumont Yard to the client. (*Id.* at #16; Doc. 1-10, #191). The log is consistent with a pattern reflected in several of Navarrete's logs, (Doc. 1, #16; Doc. 1-10, #192–97), including those submitted in connection with different invoices and billing cycles, (*see* Doc. 1, #17; Doc. 1-11 (March 27, 2023 invoice and travel logs); Doc. 1-12 (September 26, 2022 invoice and travel logs)). In total, Morales and Navarrete billed nearly 4,000 hours to Greif, averaging 2.3 hours per round trip between the Beaumont Yard and the client. (Doc. 1, #17). By contrast, other drivers averaged 1.4 hours for a trip using the same route (about what Greif has estimated). (*Id.* at #18). Take, for example, Frank Young, another Transcend driver. In a July 17, 2020, travel log, Young performed three round trips between the Beaumont Yard and the client, plus a trip to La Porte, Texas, in 3.5 hours. (*Id.*; Doc. 1-13, #222 (Young travel log)).

Greif alleges that this chicanery resulted in some $100,000 in overpayments to Transcend in connection with trips from the Beaumont Yard to the unidentified client. (Doc. 1, #18). Silva, as Shipping Coordinator, approved Transcend's allegedly fraudulent invoices, thus allowing the conspirators to profit. (*Id.*). Like the Beaumont Yard sublease, Transcend billed Greif for these transfers through Coupa. (*Id.* at #14).

9

After it became wise to Transcend's alleged shenanigans, Greif terminated the Beaumont Yard lease in December 2023. (*Id.* at #19). And after that, Greif never again heard from the client regarding transportation needs. (*Id.*). Greif regards that as an indication that "the Beaumont [Y]ard lease was completely unnecessary and served no purpose other than to subject Greif to high charges and padded hours for short trips." (*Id.*).

### 2. The Trailer-Retrieval Scheme.

Greif's investigation into Silva revealed another Transcend-related scheme, this time involving Greif's trailer-retrieval process. (*Id.*). Transcend became Greif's principal shipping provider in July 2021. (*Id.* at #20). This marked a shift in the allocation of Greif's shipping business. For example, in January 2021, "four separate shipping providers performed a total of 70 trailer retrievals," with Transcend accounting for only 3% of the retrievals for a total price of $260. (*Id.*). But seven months later, in July 2021, Transcend performed 96% of Greif's 107 trailer retrievals that month, costing Greif something on the order of $28,000. (*Id.*). Then, from July 2021 to December 2023, Transcend was responsible for 75% or more of Greif's monthly trailer retrievals. (*Id.* at #22). And for 24 of those 30 months, Transcend was the carrier for 90% or more of the retrievals. (*Id.*).

Why the sudden shift? Greif's explanation is that Silva interfered in BluJay's ordinary bidding-and-award process. (*Id.* at #6). BluJay, recall, is the software that Greif uses to process shipping bids from its list of contracted carriers. (*Id.*). Ordinarily, BluJay recommends a shipping carrier based on the carrier that

10

submitted the lowest bid, and the Shipping Coordinator then awards the job to that bidder. (*Id.*). But, starting in July 2021, Silva began bypassing the bidding process and awarding jobs to Transcend, regardless of whether that decision was cost-justified. (*Id.* at #20). Greif says that some of Silva's manual entries were for trips that Greif did not need, while others were for jobs that Transcend never performed at all. (*Id.*). Of the nearly 6,800 manual overrides that Silva performed, 5,500 awarded jobs to Transcend, and at least 4,700 of those were awarded in connection with trailer retrievals or purported trailer retrievals. (*Id.*). As to the latter, Greif says that the data collected from its GPS tracking devices reveal that, in many cases, the trailers supposedly in need of transport either never moved or moved in a manner inconsistent with the documentation that Transcend submitted. (*Id.*).

Greif's Complaint offers several examples. On April 1, 2022, Transcend purportedly moved three trailers from La Porte to Houston, billing Greif some $780. (*Id.* at #21–22). Yet Greif's GPS data indicates that all three trailers remained stationary during the pertinent time frame. (*Id.* at #21). Nonetheless, Silva approved the invoice submitted for these three retrievals. (*Id.*). All of this is consistent with a pattern of hundreds, if not thousands, of similar "phantom trailer movements" that Silva approved. (*Id.*).

### 3. The Inter-Facility-Transfer Scheme.

Greif uncovered a similar scheme involving its inter-facility-transfer operations, which Davis principally orchestrated. Greif says that, starting in early 2021, Davis began manually awarding loads in need of transport between Greif's HS1

11

and HS2 facilities on a manual basis, overriding BluJay's ordinary bid-selection process, just like Silva did in connection with Greif's trailer-retrieval operations. (*Id.* at #22).

One example involves a bill of lading dated March 5, 2021. (*Id.*). The bill specified a transfer of two steel coils from HS1 to HS2. (*Id.*; Doc. 1-14 (March 5, 2021 bill of lading)). Instead of uploading this bill to BluJay only once (i.e., on March 5, 2021), Davis allegedly uploaded it nearly 50 more times to justify awarding jobs to either Transcend or Excel. (Doc. 1, #22). In just one of those instances, which occurred on March 13, 2021, Greif ended up paying some $1,620. (*Id.*). Greif describes several other examples of the same pattern, including a June 14, 2021, bill of lading uploaded three separate times, and a January 31, 2022, bill of lading uploaded 53 times. (*Id.* at #22–23). Many of these uploads were for jobs that never actually occurred. (*Id.*).

What's more, Davis should not have been uploading bills of lading *at all*. As a Customer Service Specialist, awarding loads to carriers fell outside Davis's job duties. (*Id.* at #23). So she needed Silva, the Shipping Coordinator, to look the other way when she uploaded the documentation for the allegedly fraudulent transfers, which he did. (*Id.*). From July 2021 to December 2023, Davis performed 592 manual overrides, awarding 580 jobs to Transcend and 12 to Excel. (*Id.*).

## C. Greif's Investigation Reveals Several Falsehoods Told to Cover Up the Conspiracy and Illicit Communications Between the Defendants.

There's more. In addition to uncovering the three schemes detailed above, Greif's investigation revealed several pieces of evidence indicating that the Defendants lied to Greif in order to keep their various plots secret.

For example, Greif alleges it found out that Davis lied during an interview Greif did during its investigation, the date of which is not specified in the Complaint. Specifically, Greif asked Davis whether she had ever performed any work for Transcend. (*Id.* at #24). According to Greif, she said no, which was a "lie to conceal the fraudulent scheme" that the Defendants were undertaking. (*Id.*). Davis had, in fact, overridden Greif's bidding process numerous times to manually award jobs to Transcend and Excel. (*Id.*). She also never disclosed that her brother, Mack, owned both companies. (*Id.*).

Greif's investigation led to a second revelation: a pattern of suspicious activity in Davis's company email account. (*Id.*). It turns out that Davis was using her work email account to send company documents to her *personal* email account. (*Id.*). Those documents included, for example, customer lists. (*Id.*; Doc. 1-17 (email with customer list)). Greif also discovered that Davis was apparently transacting *Transcend* business using her Greif email account. For example, on February 20, 2023, Becca Owens, an account manager at the Thomas Wilson Group, LLC, emailed both Davis (at her Greif email account) and Davis's husband (who is a member at Transcend) to inquire about former Transcend driver David Flores's driver's license status—a question involving internal information from Transcend, not Greif. (Doc. 1, #25; Doc. 1-18 (Owens email)). Davis wrote back explaining that Flores had not been a Transcend driver for over a year. (Doc. 1, #26; Doc. 1-18, #239). That same day, Owens asked whether an attached Driver and Equipment list was current. (Doc. 1, #26; Doc.

13

1-18, #238). And that list contained information for Transcend, not Greif, employees. (Doc. 1, #27).

Davis also used her Greif email account to correspond with Silva about Transcend company matters while on the clock for Greif. (*Id.* at #28). For example, in a December 22, 2023, email, Davis asks Silva to execute documents on behalf of Transcend, one of which was a lease termination agreement between Transcend and Ezequiel Navarrete—one of the Transcend employees involved in the Beaumont Yard scheme detailed above. (*Id.* at #28–29; Doc. 1-19). Likewise, in February 2023, Silva emailed Davis regarding a motor vehicle lease agreement for Manuel Morales—the other driver implicated in the Beaumont scheme. (Doc. 1, #30; Doc. 1-20 (Morales email and motor lease agreement)).

Mack is also a frequent interlocuter in Davis's and Silva's email communications. On April 24, 2023, for example, Silva emailed Mack and Davis a time sheet and W-4 form for a Transcend employee, which Davis then forwarded to her personal email account. (Doc. 1, #32; Doc. 1-21 (April 24, 2023, email)). Other emails that Davis forwarded to her personal email account using her Greif account include emails containing Greif's shipments with Transcend, Greif's proof of delivery, Greif's bills of lading, copies of Greif's order acknowledgements, and emails containing information for Transcend employees submitted to Greif. (Doc. 1, #34; Doc. 1-22 (Davis emails)). According to Greif, Davis's and Silva's email activity using their Greif email accounts shows that both were "entrenched" in the "Transcend, Excel, and Mack-backed schemes." (Doc. 1, #35).

14

**D.    Greif's Theories of Liability and the Defendants' Motions to Dismiss.**

All told, Greif alleges that this pattern of fraudulent conduct enabled the Defendants to profit at Greif's expense. (*Id.*). Based on that, Greif asserts thirteen counts: (1) a claim under RICO's civil cause of action against all Defendants for their various means of defrauding Greif, (*id.* at #36–40); (2) a civil RICO conspiracy claim against all Defendants for forming a conspiracy to defraud Greif, (*id.* at #40–44); (3) a claim under the Ohio Corrupt Practices Act (OCPA) against all Defendants on the same grounds that support Greif's civil RICO claim, (*id.* at #44–48); (4) an OCPA conspiracy claim against all Defendants on the same grounds that support Greif's civil RICO conspiracy claim, (*id.* at #48–52); (5) a civil conspiracy claim against all Defendants that is based on substantially the same grounds as Greif's civil RICO claim, (*id.* at #52–53); (6) a fraudulent concealment and misrepresentation claim against all Defendants for the various misrepresentations the Defendants made to Greif in order to keep their conspiracy secret, (*id.* at #53–56); (7) a civil claim for criminal theft under Ohio Revised Code § 2307.60, (*id.* at #56–57); (8) a civil claim for a criminal act of telecommunications fraud under Ohio Revised Code § 2913.05, (*id.* at #57–58); (9) a breach of contract claim against Davis for Davis's violation of her Confidentiality Agreement with Greif, (*id.* at #58–59); (10) a breach of contract claim against Silva for Silva's violation of his Confidentiality and Proprietary Rights Agreement, (*id.* at #59–60); (11) a breach of contract action against Transcend and Mack for violation of Transcend's Transportation Agreement with Greif, (*id.* at #60); (12) a breach of contract claim against Excel and Mack for violation of Excel's Interchange and Brokerage Agreements with Greif, (*id.* at #61); and (13) a claim for

15

declaratory judgment against Mack on the theory that Mack is personally liable for the actions of Transcend and Excel because of Mack's "misuse of the corporate form, fraud, and other relevant grounds," (*id.* at #61–62).

Based on this alleged conduct Greif seeks a host of different forms of relief. First, a permanent injunction against the Defendants that bars them from (a) using, disclosing, or disseminating Greif's confidential business information, (b) retaining any copies, summaries or other reproductions of Greif's confidential business information, or (c) engaging in any activities that would result in the further use or disclosure of Greif's confidential business information. Second, a declaratory judgment against Mack. Third, compensatory damages in an amount exceeding $1 million. Fourth, treble damages under 18 U.S.C. § 1964(c) and Ohio Revised Code § 2923.34(E). And finally pre- and post-judgment interest; punitive damages; attorneys' fees; costs; and any other relief the Court deems appropriate. (*Id.* at #62–63).

All Defendants (except for Silva, who is in default) have now moved to dismiss. (Docs. 15, 16). Transcend, Excel, and Mack, as a group, contend that (1) the Court lacks personal jurisdiction over them and this is not an appropriate venue, (Doc. 15, #380–83); (2) the Court should dismiss the action under forum non conveniens,[6] (*id.* at #383); (3) Greif fails to state a claim for relief under any of its various theories, (*id.* at #383–405); and (4) Greif's claim for a declaratory judgment against Mack should be dismissed for want of a justiciable controversy, (*id.* at #405). Filing separately,

---

[6] As noted above, *see* supra note 1, the Court construes this as a request to transfer venue under 28 U.S.C. § 1404(a).

16

Davis contends that (1) Greif fails to state RICO or OCPA claims against Davis, (Doc. 16, #413–15); (2) the Court lacks personal jurisdiction over Davis, (*id.* at #415–18); (3) the Court is an improper venue for this action, (*id.* at #418–19); and (4) the Court should dismiss the complaint under forum non conveniens, (*id.* at #419–21). Greif has responded, (Doc. 19), and Defendants have replied, (Docs. 23, 24). So the matter is ripe for review.

## LEGAL STANDARD

### A. Motion to Dismiss under Rule 12(b)(6).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett*, 528 F.3d at 430 (quotation omitted). That is so, however, only as to well-pleaded factual allegations. The Court need not accept as true any legal conclusions alleged in a complaint; "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice. *Iqbal*, 556 U.S. at 678 (cleaned up). And while well-pleaded allegations are accepted as true, they are just that—allegations. *Id.*

17

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). That said, "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted).

**B.      Motion to Dismiss Under Rule 12(b)(2).**

When faced with a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), a court has three options: it (1) "may determine the motion on the basis of affidavits alone"; (2) "permit discovery in aid of the motion"; or (3) "conduct an evidentiary hearing on the merits of the motion." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (quoting *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). If the Court decides the motion on the pleadings and affidavits alone, a plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* (quoting *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012)). In evaluating whether the plaintiff meets this "relatively slight" burden, the Court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988) (quoting *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980)). And the Court "does not weigh the controverting assertions of the party

18

seeking dismissal," so as to "prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (citing *Serras*, 875 F.2d at 1214).

Here, the Court is deciding the motion without conducting an evidentiary hearing and therefore considers the pleadings and affidavits in the light most favorable to Greif. Thus, consistent with the authority above, insofar as the parties aver conflicting accounts of the salient facts, the Court resolves those conflicts in Greif's favor. With that version of the facts in mind, "[d]ismissal in this procedural posture is proper only if all the specific facts which the plaintiff … alleges collectively fail to state a prima facie case for jurisdiction." *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (emphasis removed) (quoting *Theunissen*, 935 F.2d at 1458).

## LAW AND ANALYSIS

### A.    Excel (but not Transcend) Has Consented to Personal Jurisdiction in the Southern District of Ohio by Virtue of a Forum-Selection Clause.

The Court begins with personal jurisdiction. *See Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 566 (6th Cir. 2001) ("As with every case, we begin with any jurisdictional issues."). But in light of civil RICO's unique venue and jurisdiction provisions, which provide for nationwide service of process in certain circumstances, that analysis looks a bit different than it normally might. Here are the pertinent statutory provisions:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpoenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpoena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

The Sixth Circuit recently explained the import of some of this language in *Peters Broadcast Engineering, Inc. v. 24 Capital, LLC*, 40 F.4th 432 (6th Cir. 2022). There, the court noted that, over the past thirty years, a circuit split has emerged as to which of these provisions provide for service of process on out-of-district defendants. *Id.* at 438. The Fourth and Eleventh Circuits hold that § 1965(d) governs such service, *see ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997); *Rep. of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997), while the Second, Third, Seventh, Ninth, Tenth, and D.C. Circuits hold that § 1965(b) is the relevant provision, *see PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d

20

65, 71–72 (2d Cir. 1998); *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 117 (3d Cir. 2020); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987); *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 538–39 (9th Cir. 1986); *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229–31 (10th Cir. 2006); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1098–1100 (D.C. Cir. 2008), *overruled on other grounds by*, *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 891 (D.C. Cir. 2021).

The *Peters Broadcast* court adopted the latter approach, but with a few clarifications. The first concerned § 1965(a), which, the panel explained, "provides for *venue*, not jurisdiction." *Peters Broadcast*, 40 F.4th at 440. So another rule, "such as Federal Rule of Civil Procedure 4(k)(1)(A) and the relevant state's long-arm statue," is necessary to establish jurisdiction over an initial civil RICO defendant. *Id.* The second clarification focused on § 1965(b)'s relationship to § 1965(a). Once a district court has personal jurisdiction over an initial defendant (and therefore venue is appropriate under § 1965(a)), § 1965(b) "extends personal jurisdiction through nationwide service of process over 'other parties residing in any other district,'" as long as the "'ends of justice' require it." *Id.* (quoting 18 U.S.C. §§ 1965(a)–(b)).

So, in sum, a "plaintiff must satisfy two requirements to establish personal jurisdiction under § 1965(b): (1) at least one other defendant must have minimum contacts with the forum state, and (2) the 'ends of justice' must require that the district court in question is the one in which the matter should be heard." *Doe v.*

21

*Varsity Brands, LLC*, No. 1:22-cv-2139, 2023 WL 4935933, at *14 (N.D. Ohio Aug. 2, 2023).

Greif offers several contacts-based arguments for personal jurisdiction over an initial "anchor" defendant. But it also says that the Court should give its forum-selection clauses with Transcend and Excel "controlling weight." (Doc. 19, #457 n.4 (quoting *Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 60 (2013))). Because "[a] party that validly consents to the jurisdiction of a particular court in a forum-selection clause waives his or her lack-of-personal-jurisdiction defense," *Traton News, LLC v. Traton Corp.*, 914 F. Supp. 2d 901, 907 (S.D. Ohio 2012) (citation omitted), the Court starts here.

> **1. Transcend Has Not Consented to Personal Jurisdiction in the Southern District of Ohio by Virtue of the Transportation Agreement's Forum-Selection Clause.**

As there are three different agreements at issue (one with Transcend and two with Excel), the Court elects to start with the forum-selection clause in Greif's Transportation Agreement with Transcend. That clause provides that "[a]ll judicial actions or arbitration proceedings affecting this agreement shall be conducted in Delaware County, Ohio, or such other location as mutually agreed to, in writing, by the parties." (Doc. 1-4, #79). Greif says that this language shows that Transcend consented to personal jurisdiction in the Southern District of Ohio by signing an agreement with a forum-selection clause "focused on Ohio." (Doc. 19, #440).

Not so fast. Even granting each of Greif's premises, the conclusion it seeks does not follow. True, under *Atlantic Marine*, a court may almost never set aside a valid

22

and binding forum-selection clause. *See* 571 U.S. at 66. And here, the clause is, in some sense, "focused on Ohio." (Doc. 19, #440). But rather than showing that Transcend has consented to personal jurisdiction in a federal court in the Southern District of Ohio, it actually shows the opposite. That's because the clause requires that all "judicial actions or arbitration proceedings" be "conducted *in* Delaware County, Ohio." (Doc. 1-4, #79 (emphasis added)). That matters because the Southern District of Ohio does not have a seat of court in Delaware County. The closest it comes is a seat of court in Franklin County, which adjoins Delaware County. So a clause that requires judicial actions or arbitration proceedings to occur "in Delaware County," means Greif cannot rely on the clause to establish Transcend's consent to this (or indeed any) federal forum. *See Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 76 (2d Cir. 2009).

True, the "wording of the clause" does not literally say *no actions in federal court. Id.* But this objection "misses the point." *Id.* The forum-selection clause contains "obligatory venue language" that expresses the "parties' commitment to trial in [Delaware] County. Had there been a federal court located in [Delaware] County," then the clause could be read to express the parties' intent to litigate in the Southern District of Ohio. *Id.* But the Court is "free only to interpret and enforce the clause as written," and as written, it does not evince an intent to litigate in this Court. *Id.* at 77; *see also Wall St. Aubrey Golf, LLC v. Aubrey*, 189 F. App'x 82, 86–87 (3d Cir. 2006) (holding that it would "torture logic" to read a provision that provided for venue "in Butler County" as authorizing federal jurisdiction in a federal court that "ha[d]

jurisdiction over Butler County" but nonetheless *sat* in "Erie, Cambria, and Allegheny Counties"); *Argyll Equities LLC v. Paolino*, 211 F. App'x 317, 319 (5th Cir. 2006) (holding that a federal court based in Bexar County did not "sit[] in" Kendall County); *Collin Cnty. v. Siemens Bus. Servs., Inc.*, 250 F. App'x 45, 52 (5th Cir. 2007) (holding that a forum-selection clause precluded federal jurisdiction where the clause specified a county in which no federal court existed).

Admittedly, some courts take a broader view of language like that at issue here. Those courts hold that county-specific forum-selection clauses "do not preclude litigation in the federal court that encompasses the county identified in the forum selection clause." *Ahern v. Fidelity Nat'l Title Ins. Co.*, 664 F. Supp. 2d 1224, 1227 (M.D. Fla. 2009) (first citing *Priority Healthcare Corp. v. Chaudhuri*, No. 08-cv-425, 2008 WL 2477623, at *2–3 (M.D. Fla. June 18, 2008); and then citing *Links Design, Inc. v. Lahr*, 731 F. Supp. 1535, 1536 (M.D. Fla. 1990)). But the Court is not persuaded. To interpret a forum-selection clause is to interpret a contract, and "[c]ontract interpretation is fundamentally a matter of state law." *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 327 n.12 (6th Cir. 2024) (citing *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015)). In Ohio, contracts "must be given a just and reasonable construction that carries out the intent of the parties as evidenced by the contractual language." *Ohio Water Dev. Auth. v. W. Rsrv. Water Dist.*, 776 N.E.2d 530, 535 (Ohio Ct. App. 2002) (citing *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 375 (Ohio 1974)).[7] "The parties' intent is presumed to reside solely within the language

---

[7] The Transportation Agreement contains a choice-of-law provision that calls for the application of Ohio law in connection with the "formation, execution, and performance" of the

24

employed in the agreement." *Id.* (citing *Kelly v. Med. Life Ins. Co.,* 509 N.E.2d 411, 411–12 (Ohio 1987)). Against that backdrop, the Court concludes that the best approach is to take the forum-selection clause at its word and hold that it evinces Transcend's consent to the jurisdiction of courts physically located "*in* Delaware County," (Doc. 1-4, #79 (emphasis added)), which does not include this Court.[8]

> **2. Excel Has Consented to Personal Jurisdiction by Virtue of the Forum-Selection Clause in the Transportation Brokerage Agreement.**

Next, consider Excel's forum-selection clauses, of which there are two. The first, which appears in the Master Interchange Agreement, is identical to the clause that the Court just analyzed. (*See* Doc. 1-5, #87). So the same analysis applies. But the corresponding clause in the Transportation Brokerage Agreement departs from the other two clauses in key respects. Rather than merely providing for venue "in

---

Agreement, and all parties assume in their briefing that Ohio law applies. (Doc. 1-4, #79). Thus, "[t]he parties' litigation choices allow [the Court] to avoid th[e] choice-of-law issue" that the Agreement implicates. *AtriCure, Inc. v. Meng*, 12 F.4th 516, 525 (6th Cir. 2021); *see also Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019) (citing *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991)) ("[Courts] regularly rely on the litigants' agreement about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid deciding what could be knotty choice-of-law questions.").

[8] The Court notes that, while it rejects *Ahern*'s broad approach to forum-selection clauses of this sort, the Court also rejects a rule that it deems too restrictive in the other direction. The Tenth Circuit has held that any time a mandatory forum-selection clause specifies the proper forum in terms of "a specific county" rather than "a specific judicial district," the clause evinces an intent to litigate "only in state district court." *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997) (citation omitted). While this move is not wholly implausible, *Excell* overreads the plain meaning of forum-selection clauses like the one in the Transportation Agreement. A contractual intent to litigate in a particular county is consistent with an intent to litigate in a federal forum located *within* that county. *Cf. Basicomputer Corp. v. Scott*, 973 F.2d 507, 510 (6th Cir 1992) (citing *Spatz v. Nascone*, 364 F. Supp. 967, 974 (W.D. Pa. 1973)) ("Since the federal district court for the Northern District of Ohio is unquestionably a court '*in* the State of Ohio,' the forum selection clause is not limited to Ohio state courts." (emphasis in original)).

Delaware County," (Doc. 1-4, #79; Doc. 1-5, #87), the clause requires that "[a]ny legal action arising under or pursuant to this Agreement shall be brought and maintained only in *federal or state courts* located in or *having jurisdiction over* Delaware, Ohio," (Doc. 1-6, #94 (emphases added)). Importantly, courts that adhere to *Yakin*'s reasoning often hold that it does not apply where the forum-selection clause goes out of its way to mention the federal courts. *See, e.g.*, *Zhang v. Diaz*, No. 2:21-cv-4002, 2021 WL 3698387, at *4 (W.D. Mo. Aug. 19, 2021) ("To hold that the forum-selection clause here does not permit litigation in the federal court that encompasses cases within Barton County would be to render the language 'the federal courts located in Barton County, Missouri' mere surplusage."). And perhaps even more to the point, applying the provision's plain language, there is no question that this Court has "jurisdiction over" Delaware, Ohio. (Doc. 1-6, #94).[9, 10] So, the Court has personal jurisdiction over Excel based on the claims that Greif advances in this suit.

---

[9] Additionally, while neither Greif nor Excel raise the issue, the Court notes that the forum-selection clause likely applies to all of Greif's claims against Excel. Under Ohio contract law, forum-selection clauses "can apply to torts if the clause applies to 'any dispute that may arise out of this agreement or otherwise between the parties … ,' or, less broadly, to 'any dispute arising under or in connection with … ' a contract if the tort is sufficiently related." *Navidea Biopharmaceuticals, Inc. v. Cap. Royalty Parters II, L.P.*, 170 N.E.3d 472, 501 (Ohio Ct. App. 2021) (citation omitted). And those torts may include "fraud, misrepresentation[,] and conspiracy claims." *Id.* That said, because the parties decline to raise this interpretive issue, the Court declines to pursue that matter further. So too for the forum-selection clause's enforceability as a matter of federal law.

[10] Greif seems to assume, without argument, that Excel's forum-selection clause also binds Mack. The assumption is not well-taken. Because Greif fails to offer any argument for this point, it has forfeited it. That said, the Court concludes below that it has personal jurisdiction over Mack for different reasons. *See infra* Law & Analysis, Part C.1.

26

In sum, the forum selection clause in Greif's contract with Excel creates personal jurisdiction over Excel, but the corresponding clause in Greif's contract with Transcend does not provide personal jurisdiction over Transcend.[11]

**B.      Greif Fails to State a Claim Against Excel.**

A finding of personal jurisdiction over Excel should be a happy result for Greif. But here, not so much. Greif may have successfully established personal jurisdiction over Excel. But it fails to state a claim for relief against Excel. And so Excel must be dismissed.

In reaching that result, the Court can, for the most part, train its analysis on Federal Rule of Civil Procedure 9(b). That's because each of the nine claims that Greif advances against Excel—the civil RICO and civil RICO conspiracy claims (Counts I and II), the related state-law claims (Counts III and IV), the civil conspiracy claim (Count V), the fraud claim (Count VI), the civil claims for criminal acts of theft and telecommunications fraud (Counts VII and VIII), and even the breach of contract claim (Count XI)—is predicated on some species of fraud. And, under Federal Rule of Civil Procedure 9(b), a party "alleging fraud or mistake" "must state with particularity the circumstances constituting fraud or mistake." To comply with Rule 9(b)'s heightened pleading requirements, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

---

[11] As discussed below, however, Greif does have personal jurisdiction over Transcend under a traditional minimum contacts analysis. *See* infra Part C.

fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (citation omitted). "If the complaint alleges a complex and far-reaching fraudulent scheme, then that scheme must be pleaded with particularity and the complaint must also provide examples of specific fraudulent conduct that are representative samples of the scheme." *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 830 (6th Cir. 2018) (cleaned up) (quotation omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). But a plaintiff must still allege a "basis for inferring scienter"—that is, "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 406 (6th Cir. 2012) (citations omitted).

This requirement is a problem for Greif's various theories of liability against Excel, because, as the Mack Defendants point out, there are "*no* well-pleaded allegation[s] in the Complaint to explain why Excel is even a defendant in this action." (Doc. 15, #383 (emphasis added)). The point is perhaps best made by comparing Greif's allegations against Transcend to Greif's allegations against Excel. For example, Greif alleges that Transcend fraudulently charged Greif each month for the Beaumont Yard rental from June 2020 to October 2023 and attaches copies of an invoice for each month to its Complaint. (Doc. 1, #14; Doc. 1-9). Greif also describes the content of two separate invoices that allegedly overcharged Greif for services rendered in connection with the Beaumont Yard—one Transcend sent on August 11, 2023, (Doc. 1, #15; Doc. 1-10), and another it sent on March 27, 2023, (Doc. 1, #17;

Doc. 1-11). Without deciding the issue (the Court ultimately does not reach the merits of Greif's claims against Transcend), these allegations may well be sufficient for purposes of Rule 9(b) because Greif has pled the "circumstances of the fraud" with "enough specificity to put [Transcend] on notice as to the nature of the claim." *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 615 (6th Cir. 2024) (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)).

But none of Greif's allegations against Excel even come close to this standard. For example, Greif generally alleges that, at some point, Davis fraudulently awarded twelve loads to Excel. (Doc. 1, #23). But nowhere are these loads described with the kind of specificity that Greif alleges as to its transactions with Transcend. True, Greif says that Davis used the same bill of lading 47 separate times to "justify awarding manual loads to *either* Transcend or Excel." (*Id.* at #22 (emphasis added)). But which is it? And when? Again, to compare, Greif expands on its allegations against Transcend by describing several instances in which Davis allegedly used a bill of lading to fraudulently award loads to the company, including dates, the frequency of the allegedly fraudulent submissions, and even the extent of Greif's financial harm. (*See id.*). But curiously, the Complaint never fleshes out its allegations against Excel in quite the same way. Moreover, the bill of lading itself says "Transcend," not "Excel." (Doc. 1-14, #224). And, because Greif attached the bill of lading to its Complaint, the Court may consider the document without converting Excel's motion to dismiss into one for summary judgment. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011) (citation omitted).

By lumping the two companies together, Greif engages in impermissible "group pleading." *United States ex rel. Kramer v. Doyle*, No. 1:18-cv-373, 2022 WL 1186182, at *5 (S.D. Ohio Apr. 21, 2022). Under Rule 9(b), "*each* defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he *individually* stands charged." *Id.* (emphases added) (citations omitted); *see also United State ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) ("[I]mproperly pled allegations of fraud do not become adequate merely by placing them in the same complaint with allegations that are sufficient."); *Sugarlips Bakery, LLC v. A&G Franchising, LLC*, No. 3:20-cv-830, 2022 WL 210135, at *10 (M.D. Tenn. Jan. 24, 2022) ("[T]he prohibition on group pleading under Rule 9(b) prevents a plaintiff from simply lumping multiple defendants together without explaining each defendant's culpable role."). Because allegations of fraud[12] form the basis of the claims against Excel, and because Greif has failed to adequately plead a single instance of fraud, Greif fails to state a claim.[13]

---

[12] Admittedly, in addition to its allegation that Excel breached the contract by "committing fraud," Greif attaches some additional allegations to its breach-of-contract claim. (Doc. 1, #61). But Rule 9(b) aside, these additional allegations don't even meet the lesser *Twombly/Iqbal* standard. For example, Greif alleges in a wholly conclusory fashion that Excel breached the contract by "entering into transactions that create a conflict of interest." (*Id.*). But nowhere in the Complaint does Greif actually plead the "factual matter" necessary to create a plausible inference that Excel actually entered into such transactions. *Iqbal*, 556 U.S. at 678. The only "transaction" pleaded with any specificity is Greif's initial set of contracts with Excel. (Doc. 1, #10–12). But that goes only to initial contract formation, not the question whether Greif entered in *subsequent* transactions that created a conflict of interest that breached the first set of contracts. Thus, these allegations also fail to state a claim.

[13] Interestingly, the paucity of factual matter that Greif alleges against Excel is reflected in the documents that Greif attaches to its pleading. Along with the Complaint, Greif attaches over 20 exhibits. (See Docs. 1-1–1-22). Out of those exhibits, eight contain invoices or trip

Importantly, this means that Greif may not use Excel as its "anchor" defendant for purposes of civil RICO's unique venue and jurisdiction provisions. "An inadequately pleaded RICO claim against an out-of-district Defendant cannot support a finding that the 'ends of justice' require exercising personal jurisdiction" over the remaining defendants. *Anthony v. Van Over*, No. 3:22-cv-416, 2023 WL 6307960, at *5 (E.D. Tenn. Sep. 27, 2023).

In sum, the Court holds that Excel (but not Transcend) consented to personal jurisdiction in the Southern District of Ohio pursuant to a forum-selection clause with Greif. But Greif's victory on this front is hollow, as Greif fails to assert any claim against Excel. The Court therefore **GRANTS** Excel's Motion to Dismiss for Failure to State a Claim (Doc. 15) **WITHOUT PREJUDICE**. The Court now proceeds to consider whether Greif has established personal jurisdiction over the remaining defendants, and whether venue lies in this Court.

**C.     The Court Has Personal Jurisdiction Over the Remaining Defendants (Including Transcend) Under a Traditional Minimum-Contacts Analysis, and Venue is Proper in the Southern District of Ohio.**

Having exhausted Greif's arguments based on the forum-selection clauses, the Court now proceeds to consider whether it can establish contacts-based jurisdiction over any of the remaining defendants (including Transcend). Because the Court finds that it has personal jurisdiction over the non-Excel Defendants under traditional

---

logs. (*See* Docs. 1-9–1-16). Yet every single document in these exhibits is a Transcend document; Excel does not appear once.

minimum-contacts principles, it does not reach Greif's arguments under civil RICO's unique venue and jurisdiction provisions.

> **1. The Court May Exercise Personal Jurisdiction Over the Remaining Defendants Consistent with Ohio's Long-Arm Statute and Due Process.**

When a plaintiff sues an out-of-state defendant, the propriety of exercising personal jurisdiction over that defendant under *International Shoe*'s "minimum contacts" test turns on (1) whether the state's long-arm statute extends to the defendant, and (2) whether the exercise of personal jurisdiction over that defendant comports with due process. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (quoting *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994)) ("The defendant must be amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution must be met.")

> **a. Ohio's Long-Arm Statute Extends to the Limits of Due Process.**

Start with Ohio's long-arm statute, which was recently amended "to mirror the constitutional limitations for personal jurisdiction." *NOCO Co. v. Shenzhen Valuelink E-Commerce Co., Ltd.*, 550 F. Supp. 3d 488, 493 (N.D. Ohio 2021); *see* Ohio Rev. Code § 2307.382(C) ("[A] court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution."). When a state's long-arm statute extends to the limits of due process, the statutory and due process inquiries are "merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003) (citing

*Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996)).

The Court therefore proceeds directly to the due process inquiry.

> ### b.     The Court Has Specific Jurisdiction Over the Remaining Defendants.[14]

As a general matter, personal jurisdiction comes in two forms: general and specific. *Malone*, 965 F.3d at 501 (citing *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)). General jurisdiction exists when the defendant's connections to the forum state are "so continuous and systematic as to render the defendant essentially at home there." *Id.* at 501–02 (cleaned up) (quoting *Int'l Shoe Co v. Washington*, 326 U.S. 310, 316 (1945)). By contrast, specific jurisdiction "depends on an affiliation between the forum and the underlying controversy." *Id.* at 502 (quotation omitted). There is no dispute here that the Court lacks general jurisdiction over the Defendants. So the Court considers only specific jurisdiction.

The Sixth Circuit has articulated a three-part test for determining whether a district court has specific jurisdiction over a defendant:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities

---

[14] Although specific jurisdiction is, by definition, claim-specific, the Court opts to forgo a claim-by-claim analysis in light of the overlapping factual allegations that underpin each claim. *See, e.g.*, *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 21 n.6 (1st Cir. 2019) ("[W]e are proceeding on the assumption in this case that the contract and tort claims arise from the same alleged activity or occurrence in the forum State, and thus we consider precisely the same set of contacts as to both claims." (cleaned up)); *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 n.3 (3d Cir. 2007) ("We note that our usual practice is to assess specific jurisdiction on a claim-by-claim basis. However, it may not be necessary to do so for certain factually overlapping claims." (cleaned up)); *cf. Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006) ("[I]f a plaintiff's claims relate to *different* forum contacts of the defendant, specific jurisdiction must be established for each claim." (emphasis added)).

33

there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549–50 (6th Cir. 2016) (emphasis omitted) (citation omitted).

### i. The Remaining Defendants Purposefully Availed Themselves of Ohio.

Purposeful availment, "the 'constitutional touchstone' of personal jurisdiction, is present where the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.'" *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in original). The requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, … or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (quotations omitted). A nonresident defendant who "deliberately engages in 'significant activities within a State' or creates 'continuing obligations between himself and residents of the forum' satisfies this requirement." *AlixPartners*, 836 F.3d at 550 (quoting *Burger King*, 471 U.S. at 475–76). Physical presence, however, is not required. The "Supreme Court has 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction.'" *Air Prods & Controls, Inc. v. Safetech Int'l, Inc..*, 503 F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King*, 471 U.S. at 476).

34

Here, the question of purposeful availment as to each remaining Defendant is largely controlled by Sixth Circuit precedent. In *Neal v. Janssen*, the plaintiffs sued a foreign horse broker for defrauding them in connection with the sale of a particular horse. 270 F.3d 328, 330 (6th Cir. 2001). The defendant's sole defense in the trial court was that the court lacked personal jurisdiction over him, and it was also the sole issue on appeal. *Id.* at 331. In affirming the trial court's determination that it had personal jurisdiction over the defendant, the Sixth Circuit focused on the fraudulent communications that the defendant had directed into the forum state. *Id.* at 332–33. Importantly, the Court held that "[w]hen the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment." *Id.* at 332. Moreover, "the actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee." *Id.* This, the court held, was sufficient for purposes of the purposeful-availment prong of the analysis. *Id.*

More recently, in *Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914 (6th Cir. 2019), the Sixth Circuit reiterated largely the same holding. There, it held that a Kentucky court could exercise personal jurisdiction over a nonresident defendant who had "extensively" communicated with the Kentucky-based plaintiff for "well over a year." *Id.* at 919. Importantly, the defendant's "alleged misrepresentations in these communications constitute[d] the core of [the plaintiff's] fraud claims—just as in *Neal.*" *Id.*

35

So too here, and with respect to each remaining Defendant. For example, Greif alleges that Transcend routinely sent fraudulent invoices to Greif in Ohio, (*see* Doc. 1, #14–19 (describing these events with specificity)), and it even provides copies of the invoices, as well as travel logs for the trips with its pleading, (*see, e.g.*, Doc. 1-10). These invoices all bear Greif's Ohio address. (*See id.*). And, just as in *Neal* and *Power Investments*, the "actual content" of these invoices allegedly "gives rise to an intentional tort." *Neal*, 270 F.3d at 332. Under Sixth Circuit precedent, that fact alone is enough. *See id.*; *Power Invs.*, 927 F.3d at 919. The same facts suffice to show that the Court has personal jurisdiction over Mack. As Greif points out, the Sixth Circuit has held that a court may exercise "personal jurisdiction over corporate officers where the officers were active participants in the tortious conduct." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 697 (6th Cir. 2000). That is precisely what Greif alleges here. The invoices that it attaches to the Complaint help on this front as well: each bears Mack's Transcend email address in the contact-information portion of the invoice. (*See, e.g.*, Doc. 1-10, #190).

The Court has personal jurisdiction over Davis for similar reasons. Greif alleges that, starting in early 2021, Davis began routinely transmitting to Ohio the documentation necessary to fraudulently award jobs to Transcend. (*See* Doc. 1, #22). She thereby "reached the State of Ohio through her computer wires" for the purpose of submitting fraudulent communications to Greif, *The Rightthing, LLC v. Brown*, No. 2:09-cv-135, 2009 WL 249694, at *5 (N.D. Ohio Feb. 2, 2009), "a company [s]he knew to be based in Ohio," *Rexam Healthcare Packaging, Inc. v. Osiris Med., Inc.*, No.

36

3:09-cv-1584, 2010 WL 819063, at *3 (N.D. Ohio Mar. 9, 2010). And again, those very communications allegedly "give[] rise to an intentional tort."[15] *Neal*, 270 F.3d at 332.

In her Reply, (*see* Doc. 23, #512), Davis offers a beguiling suggestion based on the Sixth Circuit's decision in *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000). *Calphalon* rejected as insufficient a Minnesota corporation's contacts with Ohio. 228 F.3d at 720, 723. The corporation had agreed to serve as an Ohio manufacturer's exclusive representative in Minnesota and four other states outside Ohio. *Id.* The mere fact of the parties' contractual relationship was insufficient to show that the Minnesota corporation purposefully availed itself of Ohio. *Id.* at 722. And the other contacts to which the manufacturer pointed—"phone, mail, and fax contact with Calphalon in Ohio," as well as "physical visits there"—were insufficient because they were an artifact of the plaintiff's decision "to be headquartered in Ohio," rather than a deliberate choice to "create continuous and substantial consequences there." *Id.* at 723 (quotation omitted). In other words, the contacts were "purely fortuitous" because the defendant was not attempting to "exploit any market" in Ohio, and because "no facts connected the subject matter or performance of the contract at issue to the forum state." *Id.* at 722–23. The Sixth Circuit held that these were "precisely the type of 'random,' 'fortuitous,' and 'attenuated' contacts that the

---

[15] Although Silva is in default, the Court notes that what goes for Davis goes for him, as some of the conduct alleged against him is essentially the same as the conduct alleged against Davis. Like Davis, Silva allegedly directed documentation to Greif in Ohio through Greif's BluJay system for the purpose of defrauding Greif. (*See* Doc. 1, #5–6, 20–21, 36). This will become relevant when the Court considers the Defendants' arguments for venue transfer. *See* infra Law & Analysis, Part D.

purposeful availment requirement is meant to prevent from causing jurisdiction." *Id.* at 723.

Similarly, in *Bulso v. O'Shea*, a Tennessee attorney brought an action against out-of-state former clients, alleging malicious prosecution stemming from an out-of-state legal malpractice action. 730 F. App'x 347, 348–49 (6th Cir. 2018). The attorney appealed to the Sixth Circuit when a Tennessee district court dismissed the case for lack of personal jurisdiction over the out-of-state defendants. *Id.* at 349. On appeal, the Sixth Circuit affirmed the jurisdictional dismissal. *Id.* at 349–52. The result was controlled by *Calphalon*. Just like the *Calphalon* defendants, the *Bulso* defendants' contacts were a product of "Bulso's law firm being located in Tennessee," rather than a product of the defendants' choice to "invoke the benefits and protections of Tennessee law." *Id.* at 350.

One could read these cases as lending support to Davis's (as well as the other Defendants') position. After all, as far as the Defendants were concerned, Greif could have been based in Michigan, or New York, or Pennsylvania, and it would not have made a whit of difference to the Defendants' efforts to serve Greif's *Texas* operations. In other words, nothing about the arrangement was Ohio-specific; Greif merely finds it "convenient to be present []here," and Defendants likely would have been "pleased to communicate with [Greif] wherever the latter wished." *Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 395 (6th Cir. 1997).

All of this could well be true. But it is not enough to overcome the rule from *Neal*: intentionally directing fraudulent communications into the forum state in the

38

context of an ongoing business relationship is sufficient to show purposeful

availment, at least where those very communications form the basis of the claim.[16]

*Neal*, 270 F.3d at 332; *Power Invs.*, 927 F.3d at 919; *see also Johnson v. Griffin*, 85

F.4th 429, 435 (6th Cir. 2023) (citing *Neal*, 270 F.3d at 332) (relying on *Neal* for the

proposition that "making phone calls" and "sending facsimiles" may "alone" be

sufficient for personal jurisdiction.).

In sum, Greif has shown that the remaining Defendants purposefully availed

themselves of Ohio.

### ii.    Greif's Causes of Action Arise from Defendant's Activities in Ohio.

Next up is the requirement that Greif's causes of action "arise from" the

Defendants' Ohio contacts. *AlixPartners*, 836 F.3d at 552. The Sixth Circuit has

articulated the content of this requirement in several ways, "such as whether the

causes of action were made possible by or lie in the wake of the defendant's contacts,

or whether the causes of action are related to or connected with the defendant's

contacts with the forum state." *Id.* (citation omitted). The standard is lenient, and

---

[16] For this reason, Davis's reliance (*see* Doc. 16, #417–18; Doc. 23, #507–10), on *Total Quality Logistics, LLC v. DeSantis*, No. 1:18-cv-796, 2023 WL 4686359 (S.D. Ohio July 21, 2023) is misplaced. There, a company sued an out-of-state former employee for breaching a noncompete and for tortiously interfering with another employee's employment relationship with the plaintiff. *Id.* at *1. The plaintiff argued that the defendant "purposefully availed himself of Ohio by working for any Ohio company, communicating with that Ohio company, and benefiting from his employment." *Id.* at *5. Additionally, the defendant "knew that [the plaintiff], an Ohio company, would be harmed when [the defendant] allegedly tortiously interfered with [the third party's] contract with [the plaintiff]." *Id.* Relying on *Bulso*, the court concluded that these contacts were not enough. *Id.* Crucially, though, the "attenuated actions" to which the plaintiff pointed as a basis for jurisdiction did not include directing fraudulent documentation to the plaintiff in the forum state via interstate wires. *See id.*

39

"the cause of action need not 'formally' arise from" the defendant's contacts. *Id.* Generally, "this factor is satisfied if the cause of action, of whatever type, has a substantial connection with the defendant's in-state activities." *Id.* (cleaned up) (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)).

Just like in *Power Investments*, the conclusion that the contacts are sufficiently related to Greif's claims essentially follows from the Court's purposeful availment analysis. *See* 927 F.3d at 919. Greif's Complaint alleges a series of fraudulent schemes that Defendants could not have carried out but for their relationships with Greif. (*See* Doc. 1, #10, #14–24). And more narrowly, the allegedly fraudulent communications directed to Ohio are what give rise to Greif's claims. So the claims have a "substantial connection" to the Defendants' Ohio contacts, which is sufficient to satisfy this second prong. *AlixPartners*, 836 F.3d at 552.

### iii. The Court's Exercise of Personal Jurisdiction Over Defendants is Reasonable.

Finally, the Court considers "whether exercising personal jurisdiction over [Defendants] would be reasonable, i.e., whether it would comport with traditional notions of fair play and substantial justice." *CompuServe*, 89 F.3d at 1267–68 (quotation omitted). In analyzing this third criterion, the Court would typically consider "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *AlixPartners*, 836 F.3d at 552 (quotation omitted). But "[w]here, as here, the first two criteria [of the three-part test for specific jurisdiction] are met … only the unusual case will not meet this third criterion." *Id.*

(quoting *Theunissen*, 935 F.2d at 1461). Indeed, the Sixth Circuit has stated that an "inference of reasonableness" arises when the first two prongs for specific jurisdiction are satisfied. *Air Prods.*, 503 F.3d at 555. Accordingly, the last prong is satisfied as to each remaining Defendant, too. So the Court has personal jurisdiction over all of the Defendants, other than Excel, under traditional long-arm notions, without even needing to rely on RICO's nationwide service of process provisions.

### 2. Venue is Proper in the Southern District of Ohio.

Now consider venue. All Defendants contend that venue is improper. (Doc. 15, #380–83; Doc. 16, #418–19; Doc. 23, # 517–19; Doc. 24, #533–34). The Court disagrees.

Under 28 U.S.C. § 1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." "The Sixth Circuit has held the language of § 1391(b)(2) to mean that venue is proper in any forum with a 'substantial connection' to the plaintiff's claims." *Bluecross Blueshield of Tenn., Inc. v. Dunwoody Labs, Inc.*, No. 1:20-cv-167, 2021 WL 6275252, at *7 (E.D. Tenn. Mar. 8, 2021) (citation omitted). And sending fraudulent communications into a district where the injury is felt is sufficient. *See id.* at *8 (holding that "directing [] fraudulent claims" to the location of the plaintiff's "losses" was "sufficient for venue to be proper in the Eastern District of Tennessee."). Here, each Defendant did that. *See* supra Law & Analysis, Part C.1.

Defendants try to resist this conclusion by arguing that *most* (or all) of the relevant events took place in Texas. (*See* Doc. 16, #419; Doc. 23, #518). But that misses the point. "[T]he forum need not be the district with the *most* substantial

41

connection to the events underlying the claims." *Bluecross Blueshield of Tenn.*, 2021 WL 6275252, at \*7 (emphasis added) (citing *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263–64 (6th Cir. 1998)). It's enough that the connection is "substantial." *Id.*

Accordingly, the Court finds that venue is proper in the Southern District of Ohio.[17]

### D.  The Court Will Transfer the Action to the Southern District of Texas Under 28 U.S.C. § 1404(a).[18]

To take stock: the Court has found that it has jurisdiction over the Defendants (except for Excel, whom the Court has already dismissed under Rule 12(b)(6)), and

---

[17] The Court elects to undertake a traditional 28 U.S.C. § 1391 venue analysis, rather than a RICO-based venue analysis. That's because finding that venue lies in the Southern District of Ohio under RICO's "anchor defendant" approach would require the Court to determine whether "the ends of justice require that other parties residing in any other district be brought before the court." 18 U.S.C. § 1965(b); *see Peters Broadcast*, 40 F.4th at 440. The Sixth Circuit has not yet had occasion to opine on the ends-of-justice inquiry. *See Peters Broadcast,* 40 F.4th at 440 n.4 ("We need not, and therefore do not, delve into the meaning of § 1965(b)'s 'ends of justice' language because there is no initial defendant that meets the requirements of § 1965(a)."). And other courts have taken disparate approaches. *Contrast Butcher's Union*, 788 F.2d at 539 ("For nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is *no other district* in which a court will have jurisdiction over all of the alleged co-conspirators." (emphasis added)), *with, e.g.*, *Cory*, 468 F.3d at 1232 (rejecting *Butcher's Union* in favor of a "flexible [approach] uniquely tailored to the facts of each case"). Because the Court need not wade into these murky waters to resolve the jurisdiction and venue issues presented in this case, it does not do so. *See Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 54 (D.D.C. 2006) ("Section 1965, however, is not a venue *requirement*; rather, it is a substitute venue provision that a plaintiff may utilize if venue is not otherwise available." (emphasis in original)); *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 543–44 (S.D.N.Y. 2005) (quoting *Shuman v. Computer Assoc. Int'l, Inc.*, 762 F. Supp. 144, 116 (E.D. Pa. 1991) ("The RICO venue provision is supplemental to the general federal venue provision found in 28 U.S.C. § 1391.").

[18] Greif asserts that Defendants have forfeited their § 1404 argument because, rather than relying on § 1404(a), they rely on the common-law doctrine of forum non coveniens, which applies only if the proposed alternative forum is abroad. (Doc. 19, #457 n.4). Greif's forfeiture argument is mistaken; the Sixth Circuit has already rejected one much like it. *See Carver v. Knox Cnty.*, 887 F.2d 1287, 1291 (6th Cir. 1989) ("The district court did not rely upon waiver in denying the motion to transfer, and neither will this court."). That's because the statute

that venue is proper in this district. The Court now pivots to a different question: whether it should transfer the action under 28 U.S.C. § 1404(a), having found jurisdiction and venue proper. The Court concludes that it should.

Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The statute confers on the Court "broad discretion to transfer a case to any judicial district where it may have been brought originally." *Means v. U.S. Conf. of Catholic Bishops*, No. 13-cv-14916, 2015 WL 13035285, at *3 (E.D. Mich. Mar. 31, 2015) (citation omitted). Generally, the aim of a transfer is to "prevent waste of time, energy and money, and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Id.* (citation omitted). It is the defendant's burden to "overcome the presumption that the plaintiff has chosen the proper forum." *Id.* (quotation omitted).

But there's a wrinkle—Transcend's forum selection clause. As detailed, that clause provides for venue in Delaware County, Ohio. *See* Law & Analysis Part A.1. And because the Southern District of Ohio does not have a seat of court in Delaware County, that means that the forum-selection clause selects an Ohio state court in

---

"does not require a motion; a district court may transfer a case sua sponte." *Id.* Even were that not so, however, the Court would reject Greif's argument, as "[s]ection 1404(a) is merely a codification of the doctrine of forum non conveniens for the subset of cases in which the transferee forum is within the federal court system." *Atlantic Marine*, 571 U.S. at 60. Because the parties have had ample opportunity to brief the pertinent factors, the Court presses on with the analysis. *See, e.g.*, *Williams v. Baldolf*, No. 4:21-cv-76, 2021 WL 252579, at *2 (N.D. Ohio Jan. 26, 2021) (noting that courts must give parties an opportunity to be heard before transferring a case). To the extent that Greif's arguments on this front are perhaps a little underbaked, that's a consequence of Greif's decision to rest on its erroneous forfeiture argument.

43

Delaware County. *Id.* Under *Atlantic Maine*, the clause would ordinarily be entitled to "controlling weight in all but the most exceptional cases." 571 U.S. at 60–61 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) (Kennedy, J., concurring)). But the clause binds only Transcend, not the other parties. And so the Court must determine how to analyze the Defendants' transfer request against that backdrop.

While the Sixth Circuit has yet to weigh in on this issue, the Third and Fifth Circuits have addressed it. *See In re Howmedica Osteonics Corp.*, 867 F.3d 390 (3d Cir. 2017); *In re Rolls Royce Corp.*, 775 F.3d 671 (5th Cir. 2014). The Court is persuaded by the Third Circuit's approach (which itself took a page from the Fifth Circuit's book), and will apply it here.

The Third Circuit's *Howmedica* decision prescribes a "four-step inquiry" to use in deciding whether to transfer a matter to a different forum, forum-selection clause notwithstanding. That framework directs courts to look at "(1) the forum-selection clauses, (2) the private and public interests relevant to non-contracting parties, (3) threshold issues related to severance, and (4) which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private interests." 867 F.3d at 403–04.

### 1.  Venue was Proper in the Southern District of Texas.

Before applying that four-step framework, though, the Court begins with a preliminary inquiry—whether the Southern District of Texas is a permissible venue. After all, under § 1404(a), a court can transfer a case only to a district "where it might

44

have been brought." And, even putting aside whether the forum-selection clause specifies some other forum, if venue is not appropriate in the Southern District of Texas, that is an independent bar on the action proceeding there. So the Court must assess whether the Southern District of Texas is a permissible venue. Greif does not contest that venue is appropriate there. Nor could it. La Porte, Texas, the location of Greif's HS1 and HS2 facilities, (*see* Doc. 1, #6), is located in Harris County, Texas.[19] And the Southern District of Texas embraces Harris County.[20] Venue is proper under § 1391(b)(2) because almost all the conduct actually alleged took place in and around Greif's HS1 and HS2 facilities. (*See generally id.*). Transcend's forum-selection clause does not change that result. Under *Atlantic Marine*, venue is a matter of statutory law, which a forum-selection clause does not affect. *See* 571 U.S. at 55 ("Whether venue is 'wrong' or 'improper' depends exclusively on whether the court … satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause."). Additionally, it is clear that the Southern District of Texas would be able to exercise personal jurisdiction over the remaining defendants. Both Davis and Silva lived and worked there. Further, Mack and Excel purposefully availed themselves of Texas by seeking to serve Greif's logistics operations there. Thus, the Court holds that venue is proper in the Southern District of Texas.

---

[19] *See* About the City of La Porte, https://perma.cc/5YF8-A4KG. The Court may take judicial notice of geographic facts such as these. *See, e.g.*, *United States v. Rashid*, 483 F. Supp. 3d 514, 525 (S.D. Ohio 2020) (taking notice that a given address is in a given county).

[20] *See* Houston Division, https://perma.cc/N4XF-FPRA ; *Rashid*, 483 F. Supp. 3d at 525.

### 2. Step One: Forum-Selection Clause.

That brings us to the forum-selection clause. "At the first step, the court assumes that *Atlantic Marine* applies to parties who agreed to forum-selection clauses." *Howmedica*, 867 F.3d at 404. As explained, this means that the Court must assume that the forum-selection clause controls except in the most unusual cases. *Id.* (citation omitted). In this instance, the forum selection clause that governs disputes between Transcend and Greif calls for an Ohio state court. So, at this stage, there is a strong presumption that the proper course of action is dismissing the claim against Transcend to allow Greif to file suit in Ohio state court.[21]

### 3. Step Two: Private and Public Interests Relevant to Non-Contracting Parties.

Now take the second part of the analysis, which is a bit more involved. The Court must consider a bevy of so-called "public- and private-interest factors" to determine whether the non-contracting Defendants have carried their burden of showing that a transfer is warranted. *Atlantic Marine*, 571 U.S. at 49. Courts have identified several such factors, seven of which the Court addresses below.[22] On balance, these factors support a transfer to the Southern District of Texas.

---

[21] Dismissal, rather than transfer, would be the appropriate course of action here because a federal court may not transfer an action to state court. *See Atl. Marine*, 571 U.S. at 60 ("The appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens." (italics omitted)).

[22] Courts have broad discretion not only as to the ultimate decision to transfer a case, but also as to the factors it considers in reaching a conclusion. *See, e.g.*, *Mich. Custom Machs., Inc. v. AIT Worldwide Logistics, Inc.*, 531 F. Supp. 3d 1208, 1218 (E.D. Mich. 2021) (noting that courts "often (but are no means required to) consider" a nine-factor list; *see also Means*, 2015 WL 13035285, at *3–4 (enumerating, but not applying, all of the factors that the court

46

First, consider the weight that the Court should afford to Greif's choice of forum. Greif says that its choice is entitled to "great weight." (Doc. 19, #457 n.4 (citation omitted)). As a general matter, Greif is correct. *See, e.g.*, *Panaro v. United Airlines, Inc.*, No. 4:23-cv-45, 2024 WL 4291495, at *2 (E.D. Tenn. Sep. 25, 2024). But when, as here, most of the operative facts occurred elsewhere, a plaintiff's choice of forum is entitled to less weight than it normally would be. *Sacklow v. Saks Inc.*, 377 F. Supp. 3d 870, 878 (M.D. Tenn. 2019) (citation omitted) ("[A] plaintiff's choice of venue is entitled to less deference where the operative facts—'the site of the events from which the claim arises'—occurred elsewhere."). Stated a little differently, "when the cause of action has little connection with the chosen forum, the plaintiff's choice of forum is to be given less weight than such choice would be given otherwise." *DRFP, LLC v. Republica Bolivariana de Venez.*, 945 F. Supp. 2d 890, 902 (S.D. Ohio 2013) (bracket and citation omitted). Here, the facts pleaded overwhelmingly occurred in Texas, and all claims asserted ultimately flow from Greif's Texas operations. So, although the Court accords some weight to Greif's choice of forum, the factor is entitled to less weight than Greif suggests.

Next, consider the convenience of the parties. "A transfer at the behest of a defendant is disfavored where it merely shifts the burden of litigating in an inconvenient forum to the plaintiff." *Sacklow*, 377 F. Supp. 3d at 879 (citation omitted). But a transfer would not have that effect in this case. Although Greif is

---

might have considered). Based on the record here, the Court deems these seven factors to be most relevant.

based in Ohio, it maintains operations in Texas, and those operations are central to the claims at issue in this case. So even if it would be *more* convenient for Greif to litigate on its home turf, the company cannot seriously claim that it would be substantially inconvenienced by litigating in the district where it maintains its Texas operations. Further, Greif alleges that two of the named Defendants are based in Texas. That said, the other non-contracting Defendant (Mack) is based in Mississippi. That tends to cut in the other direction, since Mack is likely to be inconvenienced in Texas as well as Ohio. So, the Court finds that this factor slightly favors a transfer.

The convenience of non-party witnesses—a factor that courts often describe as the "most important," *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 963 (M.D. Tenn. 2008)—cuts in favor of transfer, but only slightly. Although Defendants correctly point out that the majority of witnesses in this case are likely to be based in the Southern District of Texas, they are thin on particulars. (*See* Doc. 16, #420–21). Because of this, the Court affords the factor less weight than it would if they had presented more details.

On a related note, the Court finds the next factor—the location of relevant documents, *Means*, 2015 WL 13035285, at *4—to be neutral given the relative ease with which the documents at issue in this case can be transferred electronically, *see Sacklow*, 377 F. Supp. 3d at 879 (citation omitted) ("This factor is … 'generally neutral,' because the rapid march of technology has facilitated the movement of documents to different locations.").

In addition to Greif's federal RICO claims, this case also involves various claims brought under Ohio law. So the Court next considers the Southern District of Texas's ability to apply Ohio law. *See id.* at 879–80. That factor is neutral. While Greif does advance state-law claims against the Defendants under Ohio law, Greif's RICO theories lie at the core of this dispute. And, in any event, as a general matter, "courts in [one state] are fully capable of applying [another state's] substantive law." *Metz v. U.S. Life Ins. Co. in City of New York*, 674 F. Supp. 2d 1141, 1148 (C.D. Cal. 2009).

The sixth factor, the "local interest in deciding local controversies at home," "weighs heavily in favor of transfer to the [Southern] District of Texas" because most of the events alleged "occurred in Texas," and the "relationship between" Greif and the Defendants was "centered around Texas," not Ohio. *Drake v. FedEx Ground Package Sys., Inc.*, No. 2:21-cv-2636, 2024 WL 1509677, at *4–5 (W.D. Tenn. Feb. 12, 2024). And finally, the locus of operative facts, an "important factor in resolving a motion to transfer venue," favors transfer for the same reasons. *Sacklow*, 377 F. Supp. 3d at 880 (citations and internal quotation marks omitted).

On balance the factors favor a transfer. And that is not altogether surprising—as a practical matter this case has "Texas" written all over it.

### 4. Step Three: Threshold Issues Related to Severance.

"Third, if the Step One and Step Two analyses point in different directions, then the court considers severance." *Howmedica*, 867 F.3d at 404 (citing Fed. R. Civ. P. 21). In other words, the Court ostensibly could shave off the claim against Transcend, directing that to state court, and then transfer the remainder of the case

to the Southern District of Texas. At this step, the Court is to consider, for example, whether severance is necessary to preserve diversity jurisdiction, or to cure various procedural defects. *Id.* In this case, however, transferring the matter to the Southern District of Texas implicates no such concerns. So the Court has discretion to "select the appropriate forum a based on a combination of interests addressed at the next step." *Id.* at 405.

### 5. Step Four: Efficiency and Non-Contracting Parties' Private Interests.

Finally, the Court must "exercise[] its discretion … in choosing the most appropriate course of action," taking into account "two key sets of interests." *Id.* (citations omitted). First, the Court must consider the "efficiency interests in avoiding duplicative litigation, taking into account case management techniques that can reduce inefficiencies accompanying severance, as well as any other public interests that may weigh against enforcing a forum-selection clause." *Id.* (citations omitted). And second, the Court "considers the non-contracting parties' private interests and any prejudice that a particular transfer decision would cause with respect to those interests." *Id.* (citations omitted). More granularly, the Court considers "the nature of any interests weighing against enforcement of any forum-selection clause; the relative number of non-contracting parties to contracting parties; and the non-contracting parties' relative resources." *Id.* The Court may "retain the case in its entirety, transfer the case in its entirety, or sever certain parties or claims in favor of another forum." *Id.* But "[o]nly if it determines that the strong public interest in upholding the contracting parties' settled expectations is 'overwhelmingly'

50

outweighed by the countervailing interests can the court, at this fourth step, decline to enforce a valid forum-selection clause." *Id.* (quotation omitted).

In this case, efficiency strongly favors centralizing all claims and parties in a single forum. Given the degree of factual and legal overlap between the claims and parties in this case, it simply makes no sense to cleave this case in two, sending Transcend to one forum, while sending the other Defendants to another (or, for that matter, sending Transcend to one forum (Ohio state court) while keeping the remaining defendants in this forum). *See id.* at 409 (citation omitted) ("'[T]he same issues' should be litigated in the same forum.") Indeed, Greif itself stresses "the desirability of having the whole action litigated in one court." (Doc. 19, #452 (citation omitted)). In other words, Greif agrees (if only implicitly) that sending Transcend alone to Ohio state court would make little sense.

Moreover, the non-contracting Defendants (Mack, Davis, and Silva) are more numerous than the single contracting Defendant (Transcend). *See, e.g.*, *In re Dozier Fin., Inc.*, 587 B.R. 637, 650 (Bankr. D.S.C. 2018) (declining to enforce a forum-selection clause where only one of the six defendants was bound by the clause and splitting up the case would have resulted in "substantially duplicative discovery and court proceeds"). The Court lacks detailed information as to the relative means of the parties. But the Court can reasonably surmise that Greif, one of the contracting parties and a self-described global leader in industrial packaging and products services, is better resourced than a handful of individual, non-contracting Defendants. Thus, these considerations militate in favor of concentrating the

51

litigation in a single forum, and more narrowly in favor of a transfer to the Southern District of Texas. Because the non-contracting parties' private and public interests point in the same direction, the Court concludes that this is the rare case where it is appropriate to set aside the parties' forum-selection clause in favor of a different forum. Accordingly, the Court **TRANSFERS** the case to the Southern District of Texas.

## CONCLUSION

For the reasons laid out above, the Court **GRANTS IN PART** both (1) Excel's Motion to Dismiss (Doc. 15) and (2) the remaining Defendants' Motions to Transfer (Docs. 15; 16). Specifically, the Court **DISMISSES** Excel **WITHOUT PREJUDICE**, and then **TRANSFERS** this action as to the remaining Defendants to the Southern District of Texas. All other outstanding motions are properly left for resolution by the transferee court. *Keene, Inc. v. U.S. Gypsum Co.*, No. 1:24-cv-1877, 2025 WL 1182476, at *4 (N.D. Ohio Apr. 22, 2025).

**SO ORDERED.**

February 27, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

52